**GREYHOUND LINES, INC., a Corporation, Appellant,**

v.

**Delta MILLER, Appellee.**

**No. 19163.**

United States Court of Appeals
Eighth Circuit.

Oct. 23, 1968.

Thomas M. Sullivan, of Downey, Sullivan, McCormick & FitzGerald, Kansas City, Mo., for appellant; Edward L. FitzGerald, Kansas City, Mo., was with Thomas M. Sullivan, Kansas City, Mo., on the brief.

Arthur C. Popham, of Popham, Thompson, Popham, Trusty & Conway, Kansas City, Mo., for appellee; Arthur C. Popham, Jr., Kansas City, Mo., was on the brief with Arthur C. Popham, Kansas City, Mo.

Before MEHAFFY, GIBSON and LAY, Circuit Judges.

GIBSON, Circuit Judge.

This diversity case removed from the state court resulted in a judgment of $20,000 based on a jury verdict for plaintiff Delta Miller on a claim against defendant Greyhound Lines, Inc. for damages occasioned by a fall on allegedly unsafe premises. After post-trial motions were denied, defendant filed a timely appeal. The accident complained of occurred in the terminal facilities of the defendant, located in Kansas City, Missouri. The substantive law of Missouri applies.

On June 14, 1966, about 6:30 p. m., the plaintiff arrived in a bus at defendant's bus terminal in Kansas City, Missouri. The bus stopped in parking slot No. 1 located next to the east wall of the garage area of the terminal. The passenger islands[1] used for the loading and unloading of passengers are located in slots along the south side of the garage area of the terminal. The slots are so constructed that the buses have room to park next to the island area and discharge passengers onto the passenger islands from the right front door of the bus, thus affording the passengers a shorter distance to step up or down when leaving or entering the bus. These islands are raised above the floor of the garage 7 inches, but are on the same level as the waiting room floor. They extend along the right front door of the bus, when the bus is parked in its proper position, to a point approaching the middle of the bus. The island in question is about 37 inches wide and has a metal railing on the side of the island opposite the bus which extends the length of the island but does not have any end posts or warning sign at the north end of the island area. The edges of the island on the north end were outlined in yellow paint of varying shades of discernability.

Before the passengers disembarked from the bus they were told to claim their luggage from the bus's storage compartment, which is located near the middle of the bus on the right or discharge side. As the plaintiff descended from the bus, the driver said, "Watch

---

1. The denomination "passenger island" is not technically correct as these areas are actually fingers of concrete platforms extending out into the garage floor level from the waiting room area as peninsulas and are not islands in the sense that they are raised and insulated in some fashion from all of the surrounding area. The parties, however, have used the phrase "passenger island" to denominate the area in question and we will adopt their designation as sufficiently descriptive in the context of this case.

your step down." After descending from the bus the plaintiff proceeded in the company of other passengers toward the luggage compartment to claim her luggage. The plaintiff, who is 6 feet, 1 inch tall, was walking towards the luggage compartment immediately behind a shorter woman. As they reached the curb or step-off at the north end of the island the shorter woman stepped aside allowing the plaintiff to proceed past her into the step-off area. The plaintiff, not seeing the 7-inch step, fell upon stepping from the island to the floor of the depot and fractured her left hip.

There was no claim that there was any foreign substance such as oil, or any crack or defect in the passenger island, nor was it contended that the plaintiff was pushed or crowded off of the island. The plaintiff's petition alleged that the defendant " * * * negligently failed to provide and maintain reasonably safe premises and facilities * * *." The plaintiff's position is that the 7-inch step at the end of the passenger island was not adequately marked and that she was given no warning of the step.

Immediately after the plaintiff fell, the driver of the bus, Truman Spencer, went to her aid. At this time Spencer testified that the plaintiff stated to him: "I don't know why I fell. I knew it was there", and further, "It's not your fault, it's not your fault." Spencer also testified that he could smell liquor on the plaintiff's breath.

After plaintiff fell, she was taken from the locale of the fall to St. Mary's Hospital by ambulance. After x-rays had confirmed the fact that she had a broken left hip, her doctor first tried to treat her fracture by manipulation. Failing in this, major surgery was performed on her left hip three days after she entered the hospital. In the operation parts of her bone in the hip area were removed and prosthesis of a metal pin was had in the affected area, all of which resulted in a shortening of her left leg 1½ inch.

The defendant contends, (1) that plaintiff failed to make a submissible case, (2) that the court erred in refusing to declare a mistrial or in refusing to instruct the jury to disregard plaintiff's counsel's alleged reference to a settlement, (3) errors in the admission of evidence of prior falls, (4) that plaintiff has misled and deceived defendant on important factual issues and had intentionally withheld substantial evidence, and (5) the court erred in its pretrial order No. 1 in cutting off defendant's discovery rights.

### THE SUBMISSIBLE CASE ISSUE

Defendant insists that the passenger island with its 7-inch step-off was an open, patent, ordinary and obvious condition; that the plaintiff knew of the condition or with the exercise of ordinary care should have known of the condition; and that the accident was a result of the plaintiff's own inattention which precluded her from recovering against defendant.

The liability imposed on a possessor of land to business invitees, in Missouri, is that set out in Restatement (Second), Torts § 343, pp. 215–216 (1965) and approved in Ecker v. Big Bend Bank, 407 S.W.2d 45, 47 (Mo.App.1966) and Hurst v. Chase Hotel, Inc., 421 S.W.2d 532, 534 (Mo.App.1967):

"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

"(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

"(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

"(c) fails to exercise reasonable care to protect them against the danger."

Wattels v. Marre, 303 S.W.2d 9, 14 (Mo. 1957) further sets out the applicable Missouri law regarding a land possessor's liability to an invitee:

"The basis of defendants' liability as possessors of land for injuries sus-

tained by their invitees, is defendants' superior knowledge of an unreasonable risk of harm of which the invitee does not or in the exercise of ordinary care would not know. Douglas v. Douglas, Mo.Sup., 255 S.W.2d 756, 758(4)."

The above language in the *Wattels* case was cited with approval in Colletti v. Crown Cork & Seal Company, 362 F.2d 458, 461 (8 Cir. 1966).

■ A business invitee must at all times exercise ordinary care for his own safety. *Colletti,* supra. A condition that is open and obvious, and as well known to the invitee as to the possessor, is not a basis for a claim. Harper v. First Nat. Bank of Kansas City, Mo., 196 S.W.2d 265, 267 (Mo.1946).

The plaintiff testified that she did not know the step was there and had never disembarked from a bus parked next to one of the passenger islands. Although she had used the bus infrequently over a ten-year period, she had always before loaded and unloaded at the north end of the garage section of the depot where there were no passenger islands. She further said she was unable to see the step because of the crowd of passengers on the passenger island.

There was evidence adduced at the trial of precautions taken by the defendant to guard the step-off at the end of the passenger island which would tend to show the defendant's knowledge of a dangerous or unsafe condition.[2]

There is no set formula that can be used to determine negligence in these step-and-fall cases. As pointed out by the Missouri Supreme Court in Wilkins v. Allied Stores of Missouri, 308 S.W.2d 623, 630 (Mo.1958):

"While a business invitee cannot fasten liability upon the proprietor of a store by failing or neglecting to see that which is perfectly obvious to a person in possession of his faculties, there is no exact test or formula by which it may be determined whether or not a condition is so open and obvious that one is bound to see it. Each case must turn upon its own facts and circumstances. Summa v. Morgan Real Estate Co., supra, [350 Mo. 205] 165 S.W.2d 390, 393."

■ Under the circumstances present in this case of a narrow passenger walk (37 inches wide) inserted as an island between two large buses and utilized under crowded conditions with part of the lighting obscured by the buses themselves, we cannot say as a matter of law that the step-off was open and obvious and that plaintiff should have known of its existence. Whether plaintiff was guilty of contributory negligence and whether the plaintiff should have seen the step in the exercise of ordinary care and whether the defendant was maintaining and operating an unsafe condition are all questions for the jury. We believe the plaintiff made a submissible case and the trial court properly submitted these issues to the jury.

**2.** Guerri, assistant manager of defendant's terminal, in his deposition admitted into evidence, referred to the passenger island in question as Dock No. 1 and said that the front exit door of the bus when parked for unloading would only be 4 or 5 feet from the north end of the dock, or just a couple of steps from the area on the island where a passenger would alight in getting off the bus. He further testified that all of the other Topeka buses used the north side of the garage which was level; that at one time the defendant had a warning post at the end of the step-off with an arm extending and reading "Watch Your Step"; that despite this precaution people did on occasion walk off the end of the dock. He fur-

ther testified that he had known of such instances but was indefinite of the number of such occurrences vaguely stating "more or less" half a dozen. He said the yellow painting around the edge of the dock could at times be obscured and covered with mud but that these were washed every night, weather permitting, and repainted two or three times a year as needed. Plaintiff's and defendant's exhibits of pictures of the dock area floor show the floor of the island and the floor of the garage to be darkened with use, grease and other debris generally found in like areas and that the yellow paint was fairly well worn off at the north end of the passenger island.

## INTERROGATION BY PLAINTIFF'S COUNSEL ABOUT SETTLEMENT

Plaintiff's counsel in questioning defendant's witness Yocum, a claims investigator for Claims Service Company, who had investigated this accident for the defendant, asked Yocum about the nature of his business. After Yocum indicated that his services included checking on people and making reports to the Company, the following questions were propounded and answers given:

"Q. And see if the matter can be brought to a head?

"A. Brought to a head?

"Q. Yes.

"A. Well that is not my—I don't make those decisions.

"Q. Well, you settle these claims, don't you, many of them?"

Defendant's counsel objected to the question and moved for a mistrial. The trial court overruled the motion on the basis that the questions propounded merely "asked him if that is his job."

■ Defendant views this as evidence of an offer of settlement or compromise. It is axiomatic that offers of settlement or compromise, absent extraordinary circumstances, are inadmissible and would be inadmissible in this case. We think plaintiff's counsel is skating on pretty thin ice but we don't think he fell through. The occupation of Yocum and his interest in the case were relevant, but his intent and activities in this case regarding settlement would be inadmissible as a matter of legal policy to show an offer was made or steps were taken in an attempt to settle the claim. See, 31A C.J.S. Evidence § 285 (1964).

■ We think the trial court on request should have instructed the jury to disregard the statements made in question or answer relating to Yocum's intent, but we do not think the error was prejudicial. Jurors are not so naive that most of them do not know as a matter of common knowledge that claims investigators represent their principals and seek out and emphasize facts favorable to their cause, and that they also often press for settlements on favorable terms.

## EVIDENCE OF PRIOR FALLS

The trial court over objection admitted evidence adduced from defendant's employees of other people falling or stumbling off the passenger island. Defense counsel views this evidence as too vague and unclear to afford the defendant the opportunity of investigating the circumstances of the occurrences, and further contends that the plaintiff must show that the defendant had knowledge of the incidents. Defendant cites the Missouri rule as being set forth in Blackwell v. J. J. Newberry Co., 156 S.W.2d 14, 20 (Mo.App.1941):

"We do not believe that any absolute rule can be established other than that evidence of other accidents or the absence of other accidents is admissible only where the party against whom the evidence is introduced is not, by the nature of the proof offered, deprived of an opportunity of developing, by cross-examination or otherwise, substantially all the circumstances under which such previous accidents happened or the circumstances in connection with those instances when the peril was avoided."

■■ Evidence of prior falls, when known to the possessor of premises, is relevant to show notice of a possibly dangerous condition and the fact of a dangerous condition when the circumstances are similar. McCormick, Evidence, § 167, pp. 351–352 (1954). Plaintiff has the burden of proof but the evidence of prior falls in this case was in the nature of admissions made by defendant's own employees, Guerri, assistant manager of defendant's terminal, and Spencer, the bus driver. Their knowledge is that of the corporate defendant and any vagueness or lack of clarity in the instances referred to would rest on them and the corporate defendant and not the plaintiff. No attempt was made by the plaintiff to introduce independent evidence of prior falls so as to make applicable the general principle stated in

*Blackwell,* supra. The evidence received of prior falls was well within the discretionary province of the trial court and such evidence does show knowledge of a condition that under certain circumstances of intended use could be potentially unsafe.

## CHARGES OF MISLEADING, DECEPTION AND INTENTIONAL WITHHOLDING OF SUBSTANTIAL EVIDENCE

Defendant claims that plaintiff had been drinking on the day of the accident and that she was an alcoholic, which condition caused or contributed to her accident. Plaintiff in her testimony categorically denies this.

Spencer, the bus driver, testified that he was only a few feet away from the plaintiff when she fell. He immediately went to her side and had a conversation with her, at which time he detected "[t]he smell of liquor, alcohol of some form." He had not noticed it before when the plaintiff was a passenger or in alighting from the bus. He said he did not get close enough to her before the accident.

Yocum, defendant's investigator, followed plaintiff to the hospital and observed her on a hospital cart in the hallway after she had left the emergency X-ray room. He engaged her in conversation and since she talked very quietly he said he "had to get down pretty close to her to listen" and in doing so he could smell alcohol on her breath. He admitted that plaintiff was obviously in pain and discomfort on that occasion.

Plaintiff's hospital record at St. Mary's contained the notation that she had tremors, confusions and hallucinations and was "a known alcoholic." Dr. Whiteman, a specialist in internal medicine, was called in for consultation by plaintiff's physician on June 16, 1966, two days after the accident. His diagnosis in part was "fracture of the hip, left, * * * acute alcoholism, cirrhosis of the liver, electrolyte imbalance", the latter condition resulting from dehydration; he stated alcoholism does cause some dehydration. He gave plaintiff a sedative to control the agitation from withdrawal symptoms. He further testified alcoholism could lead to lack of coordination. Plaintiff in her testimony denied these items in detail and testified that she only took a social drink occasionally.

Plaintiff in testifying about her injury said she had also been treated at the K. U. Medical Center for four months, from May 1 to September 1967 and that her hospital bill there amounted to $4,264. The evidence about the K. U. Medical Center confinement was objected to but was received on assurance of plaintiff's counsel that it would be connected by other evidence. The plaintiff suffered another fall while a patient at the K. U. Medical Center, fracturing her leg.

Defendant was not informed of this confinement at the K. U. Medical Center until just prior to trial when the matter was mentioned in the judge's chambers and no hospital record was furnished to or made available to defendant. Defendant contends that the plaintiff misled and deceived it on important factual issues and intentionally withheld substantial evidence in the case, that is, the evidence and record of the K. U. Medical Center confinement, which actions were so prejudicial to it that it is entitled to a new trial.

Defendant views the hospital record of the K. U. Medical Center as completely substantiating the defendant's position on the alcoholism issue and on its original point that this hospitalization was not required for the treatment of her broken hip. Defendant contends that plaintiff did have an advanced and serious alcohol problem. This could be of probative significance in assessing the reason for her fall; and, of course, the K. U. Medical records had impeaching significance on plaintiff's denial of having any alcoholic problem. Defendant feels that had this evidence been placed before the jury a different verdict may have resulted. The defendant asserts that it relied on the pretrial conference court order requiring the plaintiff to supply the defendant with a copy of the plaintiff's hospital records,

and that it was materially misled and surprised when at trial, it first learned of the plaintiff's hospitalization at the K. U. Medical Center.

The trial court, pursuant to Rule 20 of the General Rules of Practice of the United States District Court for the Western District of Missouri,[3] ordered that no discovery proceedings would be allowed by the court after January 25, 1967.

The defendant's request for interrogatories filed October 28, 1966, specifically asked the plaintiff about the details of her hospitalization subsequent to the accident.[4]

Both the Standard Pretrial Order No. 2 and the Stipulation of March 1, 1967 indicate that it was agreed that the plaintiff would produce, and the defendant could examine, the plaintiff's hospital records. Paragraph No. 5 of the Stipulation shows that counsel for the parties contemplated the exchange of the medical records before trial, though the defendant had not procured any medical evidence by way of an examination on its behalf.

Not having examined the hospital records of the plaintiff, the defendant in its Memorandum (trial) Brief of May 26, 1967 asked the court to order the plaintiff to produce her hospital records.[5] The court ordered the defendant to produce her hospital records on May 31, 1967

during a pretrial conference.[6] Plaintiff was confined to the K. U. Medical Center at this time, having entered there on May 1, 1967, but this fact was not disclosed when plaintiff's counsel requested a continuance.

The plaintiff obviously felt the treatment and hospitalization in the K. U. Medical Center were relevant to her case. On direct examination the plaintiff testified to the amounts of the various medical bills which she had incurred since June 14, 1966, including the K. U. Medical Center charges of $4,264.00.

Later in chambers there was a discussion as to whether the plaintiff could read into the record the following proposed question and answer which counsel had forgotten to ask an expert witness, Dr. Feierabend, the previous day:

"Question: Are you familiar with the list and amounts of expenses narrated by Mrs. Miller for hospital and medical expenses since June 14, 1966, and if so, were such charges necessary and reasonable. Answer: Yes."

This was objected to by the defendant. Then later in the proceedings:

"The Court: Isn't the K. U. Medical hospital expense in evidence?

"Mr. Popham: Yes. He produced a statement from the hospital itself."

---

3. Rule 20, Standard Pretrial Procedures for all Civil cases:

"4. (a) Unless otherwise specially ordered by the Court, within 100 days * * * each party shall complete all discovery * * *. No further or additional discovery shall be permitted thereafter except by leave of the Court for good cause shown."

4. Interrogatory Nos. 3 and 8 are as follows:

"3. Have you been treated or examined by a physician * * * since June 14, 1966? If so, please state the name of such physician, the dates of treatments or examinations, and the amount of charges for such treatments or examinations.

"8. Have you been hospitalized from and after June 14, 1966? If so, state the name of the hospital, the time of the hospitalization and the cause of the hospitalization."

5. "Accordingly, pursuant to the directions of the Court, the Defendant requests the Order of the Court directing that the hospital records and medical reports be produced for examination and copying."

6. This order was apparently an oral one, as it was not found in the record. It was, however, recognized by the plaintiff in subsequent correspondence with the court. Under date of June 21, 1967 the plaintiff's counsel, in a memorandum to the court, stated " * * * we were purchasing the complete hospital chart and they [defendant's counsel] would be welcome to examine it, * * * we have furnished defense counsel a signed copy of the report from her doctor * * * and we also loaned them the complete chart * * *."

After more discussion regarding the K. U. Medical bill the plaintiff withdrew any claim as to the K. U. bill, upon reaching an agreement with the defendant on the reasonableness and necessity for the charges and treatment of plaintiff's doctors, the St. Mary's hospital bill and a Topeka confinement bill.

Defendant's contention raises the related issue of whether a party is under a continuing duty to amend his answer to an interrogatory, which may have been correct and complete when given, but has become incomplete, incorrect and possibly misleading because of subsequent developments. This point is unsettled under our Federal Rules of Discovery and is an evolving one that will have to be resolved under trial tested experiences of varying factual situations.

This point presents conflicting considerations. As noted in 4 Moore's Federal Practice, p. 2400 (2nd ed. 1968):

"There has been no unanimity among the courts in the solution of this problem of continuing duty. Some courts have held that there is no continuing duty and an answer complete when given is an adequate answer, so long as the party giving the answer is not served with a subsequent interrogatory requesting more recent information."

Some courts view a continuing duty to disclose as desirable. The Eastern District of Pennsylvania, by its Local Rule 20(f), requires the parties to provide the other with up-to-date information if it becomes known to them:

"Upon discovery by any party of information which renders that party's prior answers to interrogatories substantially inaccurate, incomplete or untrue, such party shall file appropriate supplemental answers with reasonable promptness."

Other courts have allowed the parties themselves to designate which of the interrogatories shall be deemed to be continuing, Smith v. Acadia Overseas Freighters, 120 F.Supp. 192 (E.D.Pa. 1953); while still others have limited this to those interrogatories which by their very nature "should require continuing answers, or where the information available at pre-trial would not afford the party sufficient time and opportunity to prepare his case * * *." Novick v. Pennsylvania Railroad Company, 18 F.R.D. 296, 298 (W.D.Pa.1955). The *Novick* case analyzed the difficulties under each extreme and reached the conclusion that it is less burdensome to use, on specific request, "continuing interrogatories" than to submit follow-up interrogatories to determine whether the interrogated party has obtained any supplemental information. *Novick* also sees a duty on the part of an interrogated party to not only give truthful answers to interrogatories but to see to it that the answers given are truthful as of the time of the trial as well as when given.

The courts that hold supplemental interrogatories should be used, rather than impose a continuing obligation on the part of the answering party, base their decision on the fact that if the interrogating party wants the additional information he can submit supplemental interrogatories up to the time of trial. Gorsha v. Commercial Transport Corporation, 38 F.R.D. 188 (E.D.La.1965). This range of action does not exist in the Western District of Missouri as the time of discovery is limited, for the purpose of expediting the preparation and trial of cases.

Under the local procedural Rule 20, of the Western District of Missouri, (see footnote 3) the trial judge sets a cutoff date, which allows approximately 100 days for discovery, after which time no discovery is permitted, except for good cause shown. In practice, it is contemplated that the cutoff date will be relatively close to the trial date. In some cases, however, as in the case at bar, the cutoff date may be such that important evidence might develop after that date and before the trial date.

In this case, the trial was originally set for the first part of June 1967. This was almost six months after the date set for the completion of discovery. At the request of the plaintiff, a continuance

was granted and the case was reset for October 1967. At the time of the continuance, June 1967, plaintiff was at the K. U. Medical Center, but this fact was not disclosed to defendant. Plaintiff secured the continuance on the ground that plaintiff's counsel had to care for a member of his family who was seriously ill.

The local procedure followed in the Western District of Missouri appears to make it essential that the duty of providing additional relevant information should rest upon the answering party. Under these rules it is not possible for either party to submit additional supplemental interrogatories after the date set for the completion of discovery and the date of trial " * * * except by leave of the Court for good cause shown." Unless the requesting party knows of additional evidence, it would be difficult to show good cause. Lapse of time alone between answers to interrogatories and the trial date could well afford a sufficient basis for an order upon request to update certain types of interrogatories, especially those dealing with health, medical reports, hospital records, etc.

2A Barron and Holtzoff, Federal Practice and Procedure, § 796, p. 426 (1961) in analyzing the requirement of good cause, as used in Rule 34, Fed.R. Civ.P. notes: "A moving party's mere statement * * * that he is entitled to the relief sought is insufficient as a showing of good cause."

We think the requirement of good cause casts too great a burden on the party seeking the information, unless that party is able to rely on the continuing correctness and completeness of answers previously given. It would not be uncommon for a party to lack knowledge of new relevant information that had materialized subsequent to the discovery cutoff date, thus precluding him from discovering this information because of the requirement of showing good cause.

The purpose of our modern discovery procedure is to narrow the issues, to eliminate surprise, and to achieve substantial justice. Mr. Justice Murphy, in Hickman v. Taylor, 329 U.S. 495, 501, 507, 67 S.Ct. 385, 388, 91 L.Ed. 451 (1947) said:

"The new rules, however, restrict the pleadings to the task of general notice-giving and invest the deposition-discovery process with a vital role in the preparation for trial. * * * The way is now clear, consistent with recognized privileges, for the parties to obtain the fullest possible knowledge of the issues and facts before trial.

* * * * * *

"* * * the deposition-discovery rules are to be accorded a broad and liberal treatment. * * * Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. * * *."

The defendant in its interrogatories to the plaintiff asked for details regarding the plaintiff's hospitalization subsequent to the date of the accident. The defendant also procured a court order requiring the plaintiff to procure her hospital records. This order was complied with as to the St. Mary's records, but not as to the K. U. Medical records. We think, within the context of this case, the plaintiff could be held to be under a continuing obligation to provide the defendant with all of her hospital records subsequent to her injury, which were relevant to the issues of the case up to the date of the trial. However, we hesitate at this time to formulate any general rule covering this problem, as we believe the trial court should have discretion in carrying out discovery requirements and that inaccuracies or errors at this stage of the proceeding should not form the basis for setting aside verdicts, unless prejudicial error is shown. Furthermore, there are probably preferable methods of dealing with this subject. Sufficient for this case is the fact that the plaintiff did not comply with the court's order of May 31, 1966 directing her to furnish or make available to the defendant her complete hospital records. If the defendant were prej-

udiced by this failure remedial action is called for.

Was defendant prejudiced? The information contained in the K. U. Medical Center records was impeaching and contained further evidence of plaintiff's personal difficulties on the alcoholism issue. To a great extent this evidence was cumulative but of considerable probative significance on the particular issues developed in this case. The defendant did find out about the records immediately preceding the trial in a chamber discussion on the case and also, contrary to defendant's assertion that it "had no practical means to subpoena the records of the K. U. Medical Center in the course of the trial.", it could have subpoenaed such records under Rule 45(b) & (e), Fed.R.Civ.P. The records even though not in the District were well within the 100 miles of the trial at Kansas City. Actually they were only a short distance away, 7 or 8 miles.

The defendant, of course, also could have asked for a continuance if it felt prejudiced by the failure to disclose or produce the K. U. Medical Center records. Defendant apparently did not think these records necessary at the time of trial as it refused to agree that the treatment was necessary, though it did agree to the reasonableness of the charges. This indicates defendant did not think the treatment related to the injuries sought to be charged against it, though at that time the plaintiff was including that bill in her list of expenses. In an informal discussion in chambers the bill was later withdrawn by plaintiff. The defendant apparently, however, failed to appreciate the significance of the records on the alcoholism issue and thus came close to waiving its rights under our discovery system to view the hospital records. The procedure followed, however, did not comport with the broad purpose of our discovery rules in encouraging and demanding that the parties disclose and supply relevant evidence upon proper request. A full, free and open disclosure of relevant facts which would expedite and promote the resolution of the disputed factual issues did not prevail in this case.

We think neither the letter nor the spirit of the federal disclosure rules was satisfied. Plaintiff's K. U. Medical confinement was at the time of her trial part of her claim, was confinement material to the issues in this case, and should have been disclosed to the defendant a reasonable time prior to the trial, in response to applicable interrogatories and the court's order of May 31, 1966 directing the plaintiff to furnish or make available her hospital records to the defendant. Failure to do so prejudiced the defendant and warrants a new trial.

## CUTTING OFF DISCOVERY

Defendant asserts the court erred in cutting off discovery rights; contends the court's action was contrary to the spirit and intent of our broad and liberal discovery rules and that such action was in excess of the court's powers. No cases are cited for this contention.

Initially, we think the matter falls within the discretionary powers of the District Court and, absent abuse or prejudice, it will not be disturbed by us. Title 28 U.S.C. § 2071 grants the Supreme Court and all other courts established by Congress the power to prescribe rules for the conduct of their business consistent with congressional enactments and the rules of practice and procedure prescribed by the Supreme Court.

The court had inherent power to control the time table on discovery within reasonable limits, Freehill v. Lewis, 355 F.2d 46 (4 Cir. 1966); and also by Rule 16, Fed.R.Civ.P. relating to "Pretrial Procedure" and "Formulating Issues", the court has the specific authority to call a pretrial conference and under subsection (6) to consider "[s]uch other matters as may aid in the disposition of the action." In addition Rule 83, Fed.R.Civ.P., expressly authorizes the district courts to adopt rules governing its practice not inconsistent with the Federal Rules of Civil Procedure. The

purpose of the local Rule 20, footnote 3 supra, is to encourage the parties to timely complete their discovery so that the issues may be formulated and the case properly prepared for a reasonably prompt trial. This expedites the operation of the trial docket and serves a necessary and salutary purpose in dealing with the mounting caseload of the district courts and furthers the administration of justice. Any difficulty, misconception or prejudice in limiting the time for discovery would be eliminated by placing a continuing duty of disclosure of subsequent material facts on answers to interrogatories that were correct when made but have become incomplete or incorrect because of subsequent developments. A suggested change [7]—not yet acted upon by the Supreme Court of the United States, relating to Rule 26 governing discovery, subsection (e)—deals with this problem. It reads:

"Supplementation of Responses. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:

"(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (a) the identity and location of persons having knowledge of discoverable matters, and (b) the identity of each person expected to be called as an expert witness at trial and the subject matter on which he is expected to testify.

"(2) A party who knows or later learns that his response is incorrect is under a duty seasonably to correct the response.

"(3) A duty to supplement responses may be imposed by order of the court, agreement of the parties, or at any time prior to trial through requests for supplementation of prior responses."

We, therefore, think that the district courts have the power to place reasonable limits on discovery proceedings, and Rule 20 of the United States District Court for the Western District of Missouri is not in excess of its powers, nor is it an abuse of discretion.

However, since we feel the defendant was prejudiced by the lack of disclosure of the K. U. Medical record and did not have an opportunity to view a copy of the record in accordance with the court's pretrial order on disclosure of this phase of the case, that the interest of justice would best be served by a remand of this case for proceedings consistent with this opinion.

7. Preliminary Draft of Proposed Amendments to Rules of Civil Procedure for the United States District Courts relating to Deposition and Discovery by the Committee on Rules and Practice of the Judicial Conference of the United States (Nov. 1967).