**HAVENFIELD CORPORATION,**
**Appellee,**

v.

**H & R BLOCK, INC., Appellant.**

**No. 74–1401.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 13, 1974.

Decided Jan. 30, 1975.

Rehearing Denied Feb. 24, 1975.

Certiorari Denied June 2, 1975.

See 95 S.Ct. 2395.

Edward A. Smith, Kansas City, Mo., for appellant.

E. Frederick Beihl, Kansas City, Mo., for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, HEANEY, Circuit Judge, and MEREDITH, Chief District Judge.*

MEREDITH, Chief District Judge.

Defendant appeals from a judgment rendered against it and in favor of plaintiff after a directed verdict as to liability and a jury verdict as to damages.

This is an action brought for the recovery of a finder's fee that plaintiff claimed was due it because of its action in bringing together the defendant and a company which was acquired by defendant, Consumer Communication Services Corporation (hereinafter C.C.S.C.). The action was brought in two counts. Count I alleged an implied-in-fact contract and requested damages based upon a customary fee of $120,000. The alleged customary fee was stated to be based upon a declining percentage formula of five percent (5%) of the first million dollars of the acquisition price, four percent (4%) of the second million, three percent (3%) of the third million, two percent (2%) of the fourth million, and one percent (1%) of the remainder (hereinafter 5-4-3-2-1). The purchase price involved in this transaction was $3,000,000, which would yield a fee of $120,000, if the claimed formula was used. Count II alleged in the alternative, that the court should find an implied-in-law contract (quasi-contract) for the reasonable value of plaintiff's services which plaintiff also alleged would entitle it to a recovery of $120,000. The district court granted plaintiff's motion for directed verdict at the close of all the evidence on the issue of liability only, and submitted the case to the jury on the issue of damages alone. The jury was instructed on two theories of measuring the damages, the customary fee, if it found that one was, in fact, in existence, or a reasonable fee based upon the value of the plaintiff's services. The verdict did not specify which theory was used by the jury to arrive at its verdict.

FACTS

Plaintiff is a brokerage house, incorporated in Delaware, and having its principal place of business in New York. Gerald Griffin was the manager of plaintiff's corporate finance department. Willis Polite was an employee of plaintiff in the same department and under Griffin's supervision, but based in Cleveland, Ohio.

Defendant is a Missouri corporation, having its principal place of business in Kansas City, Missouri.

C.C.S.C. was an Ohio corporation, having its principal place of business in Columbus, Ohio. C.C.S.C. was engaged in the private postal business.

Prior to the date of December 22, 1970, Grant Bowen, an accountant with Haskins & Sells in Columbus, Ohio, who were accountants for C.C.S.C., introduced C.C.S.C. to Willis Polite for the purpose of assisting C.C.S.C. in obtaining a loan. Polite obtained a copy of "A Proposal" from Bowen, which contained financial and other information about C.C.S.C. The report had been prepared

* JAMES H. MEREDITH, Chief Judge, Eastern District of Missouri, sitting by designation.

and submitted by Paul Eckelberry, president of C.C.S.C. Polite gave the report to Griffin and discussed with him C.C.S.C.'s interests on several occasions, either by telephone from Ohio or in Griffin's office in New York.

Griffin was aware of defendant's interest in acquisitions of companies in the service industry due to the fact that he had presented an acquisition candidate to defendant on a previous occasion while he had been employed by another investment banking house.

On or about December 22, 1970, Griffin called Henry Bloch, defendant's president, and inquired into defendant's interest in acquisition in the private postal area. Bloch referred Griffin to Anthony Schwegel, defendant's director of corporate planning. Griffin stated that he had some information on a firm in the private postal industry which he would send to Schwegel, if he was interested. Schwegel expressed an interest and Griffin sent him a letter and enclosed the document entitled "A Proposal."

Between December 22, 1970, and March 24, 1971, Griffin and Schwegel had several telephone conversations in which Schwegel expressed an interest in pursuing the matter of possible acquisition. Pursuant to these conversations, plaintiff arranged a meeting between defendant and C.C.S.C., which took place in Columbus, Ohio, on March 24, 1971.

The March 24, 1971, meeting was attended by Bowen, Griffin, Schwegel, Eckelberry, and Robert Perrin, attorney for C.C.S.C. No agreement was reached at the meeting, because after some discussion, it became evident that C.C.S.C. was more interested in obtaining a loan, while defendant was more interested in an acquisition. Schwegel called Griffin shortly after the meeting and informed him that defendant was primarily interested in acquisition and wanted to think about the matter further.

On March 29, 1971, Schwegel wrote to Eckelberry and told him that defendant was interested in considering a possible association with C.C.S.C. and requested a copy of an analysis of C.C.S.C., which

had been prepared by a Mr. Rose for a lending institution, and Eckelberry sent the analysis to Schwegel.

Schwegel wrote to Eckelberry on April 16, 1971, with a copy to Griffin, stating that defendant would not establish a relationship with C.C.S.C. at that time, because they were still interested in acquisition, while C.C.S.C. only wanted a loan.

Nothing further happened until August of 1971, when Eckelberry called Schwegel and said that he was ready to consider an acquisition of C.C.S.C. by defendant. Two meetings between defendant and C.C.S.C. occurred on September 13, 1971, in Kansas City, Missouri, and on November 1, 1971, in Columbus, Ohio, at which the possible acquisition was discussed. Plaintiff was not notified that the meetings were to be held or that any negotiations had resumed.

On or about November 22, 1971, Polite told Griffin that he had learned from Bowen and Eckelberry that C.C.S.C. had resumed negotiations with the defendant. Griffin telephoned Schwegel the next day, and during the course of the conversation, Schwegel acknowledged plaintiff as the "finder." Griffin confirmed this in a letter dated November 23, 1971, in which he offered plaintiff's services in helping to consummate the deal. Neither defendant nor C.C.S.C. availed themselves of these services.

Sometime during the fall of 1971, Schwegel and Richard Bloch, defendant's board chairman, discussed plaintiff's interest in a fee, and concluded that plaintiff was, in fact, entitled to some compensation.

After meetings held in November or December of 1971 and on January 26, 1972, in Kansas City, attended by defendant, C.C.S.C., and counsel for both parties, defendant acquired the assets of C.C.S.C. for $3,000,000 in the common stock of the defendant.

Defendant has raised four issues on appeal, which will be dealt with individually below.

### I.

Defendant first argues that the district court erred in ruling that the New

York Statute of Frauds, section 5–701.10, New York General Obligations Law, McKinney's Consol. Laws, c. 24–A, which requires finder's fee contracts to be in writing, did not apply in this case. The district court held that under the Missouri rule governing choice of law, which the court was bound to follow, Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the law of the state which has the most significant contacts with the parties and the transaction is to be applied. This is also the rule stated in the Restatement of the Law, 2d, Conflict of Laws, section 188, which deals with contract actions where no express choice of law has been made:

§ 188. Law Governing in Absence of Effective Choice by the Parties

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

The Restatement was established as the law in Missouri by the Missouri Supreme Court in Kennedy v. Dixon, 439 S.W.2d 173 (Mo. en banc 1969), which was a tort action. It has since been held that the contract rules of the Restatement are also to be followed in Missouri, American Institute of Marketing Systems v. Brooks, 469 S.W.2d 932 (Mo.App.1971).

The district court held that both Ohio and Missouri had more significant contacts with the parties and transactions than did New York. Neither Ohio nor Missouri law bars the enforcement of oral contracts for finder's fees.

■ Defendant contends that the significant contacts approach is meaningless in this situation, because of the difficulty in pinpointing the location of contracting, negotiations, and performance. Defendant also contends that New York has a greater interest in having its law applied and that, therefore, it should be applied. Three cases are cited in support of this argument. Intercontinental Planning, Ltd. v. Daystrom, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969), Pallavicini v. International Telephone & Telegraph Corp., 41 A.D.2d 66, 341 N.Y.S.2d 281 (1973), and Denny v. American Tobacco Co., 308 F.Supp. 219 (N.D.Cal.1970). These cases discussed the role of New York as an international market and financial center, and the New York Legislature's desire to protect its own citizens and those who come into the state to take advantage of its unique position in the world of commerce. Also mentioned is a desire to prevent unfounded and multiple finder's fee claims from being inflicted on those whom the state wishes to protect. This, it is stated, is the reason the New York Statute of Frauds contains the provision on finder's fees. Defendant argues that because New York has taken the additional step in its Statute of Frauds, it has a greater interest in having its law enforced than do Ohio or Missouri. This appears to be an argument that the state with the strictest or most pervasive

law automatically has a greater interest in having its law applied than does a state with a more general or more lenient law. This court does not agree.

Each of the three cases cited by the defendant looked first to the most significant contacts, and found them to be in New York, and then went on to talk about the greater interest that New York had in having its law applied.

 The district court in the instant case noted the following contacts with the State of Ohio:

(1) C.C.S.C., the subject of the identification and introduction was located in Ohio.

(2) The identification and initiation of the idea took place in Ohio through the activities of Polite.

(3) The physical arrangements for the meeting took place in Ohio.

(4) The introduction and initial opportunity to propose acquisition took place in Ohio.

Defendant argues that these contacts are insignificant because the location of C.C.S.C. in Ohio was fortuitous and that H & R Block could have acquired a company located in any number of other states. The court finds little merit to this argument. In a contract action, unlike a tort action, the location of the parties and events are known ahead of time and make up a part of the general expectations of the parties. When actions are taken in a particular state, there are, or should be, expectations that the laws of that state may apply to those actions. The fact that defendant could have acquired a company in another state does nothing to diminish the contacts in Ohio.

The district court noted, as contacts in Missouri, that defendant is a Missouri corporation, with its principal place of business there, and that the acquisition was closed there. Defendant argues that the acquisition contract is separate from the finder's fee contract and that all matters relating to the acquisition contract are irrelevant. However, it is the fact that the acquisition was consummated that gives rise to liability on the finder's fee contract, so the two contracts are very closely connected.

The only New York contacts are that it is the domicile of the plaintiff, and that Griffin made his initial contacts from there. The fact that the New York party contacted the Missouri party is of some significance. With long distance communication readily available, it is often hard to pinpoint where certain negotiations and agreements take place. In a situation, such as is found in this case, determining who made the initial contact may be a factor in deciding who went into a particular state, even if only by telephone, to seek out business from another party located in that state, see Whitman v. Green, 289 F.2d 566, 568 (9th Cir. 1961). Applying that principle to the situation here, it can be concluded that plaintiff went into Missouri to pursue this transaction. Therefore, using the contact principle of justifying the reasonable expectations of the parties, it is clear that they could reasonably expect Missouri law to apply to the terms of any agreement made. It would be an unreasonable stretching of the facts to say that defendant went into New York, and, therefore, defendant is not among those persons whom the New York Legislature has a great interest in protecting.

The district court did not err in refusing to apply the New York Statute of Frauds.

## II.

The defendant's second allegation of error is that the district court improperly directed a verdict for the plaintiff on the issue of liability, because of three factual issues which defendant claims were still in dispute:

(1) Whether, at the time of the alleged contract, plaintiff had an expectation of receiving a customary fee based on the 5–4–3–2–1 formula.

(2) Whether, at the time of the alleged contract, defendant intended to pay the plaintiff a customary

fee based upon the 5–4–3–2–1 formula.

(3) Whether, in fact, the alleged finder's fee services were performed at the request and for the benefit of defendant and not some other person.

The district court specifically stated that it was not directing a verdict for a customary fee or any other amount, but was directing the verdict only as to liability to pay some fee. The question of what the amount of the fee was to be was left up to the jury. Therefore, on the first two issues noted above, the defendant received what he was entitled to, a jury determination of those questions.

 The district court based its directed verdict on an admission of liability made by defendant in its answers to interrogatories, and also on the evidence that came out during the trial.

The admission found in the answers to interrogatories stated:

Defendant has refused to compensate plaintiff in the excessive amount claimed by plaintiff, namely $120,000, but has not refused to compensate plaintiff in some lesser amount which is reasonable and commensurate with the services performed.

Defendant contends that this can only be construed as an admission of liability under Count II (quasi-contract), and, therefore, could not form a basis for a directed verdict on an implied-in-fact contract. Defendant points out that the admission speaks of a reasonable fee only. There is some question whether one can admit liability in a contract action and then limit that liability to that which would be available under a quasi-contract. If liability is admitted, that is an implicit admission that there was a contract, even if only an implied-in-fact one in which there may be some dispute over the amount of compensation due one party or the other.

The directed verdict was also based upon the evidence that was adduced at trial. Defendant argues that in order to direct a verdict, the evidence must all point one way, Giordano v. Lee, 434 F.2d 1227 (8th Cir. 1970), and that the evidence should be viewed in the light most favorable to the party against whom the verdict is directed, National Molasses Co. v. Herring, 221 F.2d 256 (8th Cir. 1955).

Keeping those two principles in mind, it is important to review some significant facts that came out in the trial:

(1) Defendant accepted plaintiff's services as far as identification and introduction.

(2) Schwegel, the employee of defendant most closely associated with the transaction, told his superiors that he felt there was an obligation on their part to compensate Havenfield for its services.

(3) Prior to the acquisition of C.C.S.C. by defendant, Schwegel acknowledged plaintiff as the "finder" in that acquisition.

(4) Four expert witnesses, including defendant's own expert, testified that plaintiff was entitled to a fee for its services.

As was noted by the district judge, in his oral ruling on the motion for directed verdict, the pretrial admission and the undisputed facts adduced at trial eliminated all litigable question on the liability of defendant to pay a fee.

Defendant argues that plaintiff's prior dealings with C.C.S.C. in looking for a loan for it, require the plaintiff to look to C.C.S.C. for its finder's fee instead of defendant. In support of this contention, defendant cites Bloomgarden v. Coyer, 156 U.S.App.D.C. 109, 479 F.2d 201 (1973). In that case the plaintiff sought a finder's fee for having brought together two parties who formed an enterprise for land development. There was evidence there, however, that his reason for doing so was to promote an enterprise that would produce future business for the company that he worked for, and not for a finder's fee. Havenfield, on the other hand, is in the business of, among other things, bringing parties together for the purposes of mergers and acquisitions. While defend-

ant is entitled to have disputed facts resolved in its favor for purposes of a directed verdict, it is not entitled to unreasonable inferences, nor to have the court draw inferences that are at war with undisputed facts. Lewis v. Nelson, 277 F.2d 207 (8th Cir. 1960).

The jury was given two instructions on the measure of damages:

Therefore, if you find that the plaintiff has proven by the evidence the following:

1. during the time plaintiff rendered to defendant and defendant accepted the services of plaintiff in identifying C.C.S.C. as a business opportunity for acquisition by defendant, furnished financial data on C.C.S.C. to defendant, arranged and attended the meeting in Columbus, Ohio, of March 24, 1971, and introduced representatives of plaintiff and defendant at said meeting;

2. thereafter offered its banking services in the acquisition of C.C.S.C. by defendant;

3. C.C.S.C. was acquired on January 26, 1972, by defendant at a price in stock of defendant valued at $3,000,000;

4. during 1970, 1971, and 1972 there was a prevailing usage, custom and practice in the investment banking business in the United States that finder's fees of investment bankers in identifying business opportunities for corporate acquisition, furnishing financial data thereon, arranging and attending a meeting of the parties to the potential acquisition, introducing them, be fixed on a declining percentage formula of 5–4–3–2–1 [677] or other such formula, contingent upon the making of the potential acquisition;

5. plaintiff and defendant in 1970, 1971 and early 1972 knew of such usage, custom and practice, or

6. such custom[,] usage, and practice was generally known by parties in circumstances similar to plaintiff and defendant;

7. neither party to this action knew or had reason to believe that the other

intended to exclude fixing of the finder's fee by such usage, custom or practice, then in such circumstances under the law the defendant became obligated to pay to the plaintiff a finder's fee determined by application of the declining percentage formula under the prevailing usage, custom and practice as you may find it from the evidence.

[C–7] If you should find that under the law and the evidence the plaintiff is not entitled to recover damages in the form of a contingent finder's fee fixed by a usage, custom and practice of the investment banking industry, then you should award to the plaintiff as damages the reasonable value of the services rendered by plaintiff to defendant in identifying the business opportunity [678] to acquire C.C.S.C., the furnishing of financial data concerning C.C.S.C., the arranging and attending the meeting between defendant and C.C.S.C. of March 24, 1971, in Columbus, Ohio, and the introduction by plaintiff of C.C.S.C. to the defendant at that meeting.

In determining the value of the services of the plaintiff you may take into consideration, among other facts in evidence, the following:

1. the contingent nature of the obligation of the defendant to pay the plaintiff for its services;

2. the value to the defendant of the idea for and identification of C.C.S.C. as a business opportunity for acquisition by the defendant;

3. the value to the defendant of the arrangement of the meeting with C.C.S.C. on March 24, 1971, at Columbus, Ohio;

4. the attendance of plaintiff at that meeting and introduction by plaintiff of C.C.S.C. to the defendant at that meeting;

5. the fact that the business opportunity to acquire C.C.S.C. was consummated by the acquisition of C.C.S.C. by defendant;

6. the amount of the purchase price paid by the defendant in its stock for the acquisition of C.C.S.C.;

7. the amount of time of the officers and employees [679] of plaintiff expended in rendering the services to the defendant; and

8. the offer of availability of the plaintiff to render investment banking services in the consummation of the acquisition.

After considering these matters, and all other facts you find from the evidence, you shall determine the damages of the plaintiff to be the reasonable value of the services so rendered by plaintiff to defendant, unless you find under the law as stated in this charge the damages should be fixed under the alleged prevailing usage, custom and practice of the industry.

■ The first instruction would be the proper measure under a contract implied-in-fact, if there is a customary fee in the particular business involved, Hill v. Waxberg, 237 F.2d 936, 16 Alaska 477 (9th Cir. 1956), which the jury was first required to find. The second would be applicable where there is no customary fee. The defendant has argued that the giving of both instructions amounted to an improper mixing of the theories of implied-in-fact and implied-in-law (quasi) contracts. However, there is ample evidence about customary fees to entitle plaintiff to an instruction on them, and the second instruction is the same measure to which the defendant has admitted the extent of its liability. It cannot now say it is improper.

In light of the defendant's admission and the undisputed evidence, it cannot be held that the district court erred in directing a verdict for plaintiff on the issue of liability.

### III.

Defendant's third contention is that the district court erred in refusing to allow defendant to file supplemental answers to plaintiff's interrogatories, and in not admitting evidence relating to those answers.

The supplemental answers were stricken because they were submitted after discovery had been closed, pursuant to Local Rule 20 of the District Court for the Western District of Missouri. Under that rule, supplemental answers are prohibited after the close of discovery, unless filed with leave of court for good cause shown. Defendant claims that it did not need to obtain leave of court because the supplemental answers were filed pursuant to Rule 26(e), Fed.R. Civ.P., which was exempted from the Local Rule 20 limitation by pretrial order. Defendant also contends that since Rule 26(e) imposes a duty upon parties to file supplements to discovery, leave of court is not required.

The substance of the supplemental answers is a basic change in the defendant's contentions on the issue of liability, and is an attempt to relieve itself from the impact of the admission of liability contained in its original answers. The new claim is that plaintiff was acting on behalf of C.C.S.C. in the transaction and should look to C.C.S.C. for any finder's fee due it. Defendant claims that it did not have any information on which to base this claim until it took Polite's deposition on March 13, 1973, and, therefore, could not have made this contention in the original answers which were filed on that same day.

At that time, the close of discovery was set at March 15, 1973. On March 16, it was extended to May 15, 1973, and later to May 30, 1973, which was the final date. The issue is whether these supplemental answers are of such a nature that they come within the scope of Rule 26(e). The pertinent parts of the rules state:

Supplementation of Responses. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows: . . .

A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which (A) he knows that the response was incorrect when made, or (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to

amend the response is in substance a knowing concealment.

The duty imposed by this rule requires a party to disclose newly discovered facts which render a prior answer either incorrect or incomplete. Defendant claims that the newly discovered facts in Polite's deposition make its prior answers incorrect. However, before any duty arises, it must also be shown that the failure to disclose the new facts would amount to a knowing concealment. In this case, the new facts were discovered from a former employee of plaintiff, and pertained to his actions on behalf of plaintiff, so failure to disclose these facts to the plaintiff does not come within the definition of a knowing concealment. The case cited by defendant, Greyhound Lines, Inc. v. Miller, 402 F.2d 134 (8th Cir. 1968), is a prime example of that with which the rule is designed to deal. In that case the plaintiff had failed to disclose certain medical records after the defendant had obtained an order requiring disclosure of all medical records. It is the new facts that the rule seeks to bring out in the open, not new contentions which may be based upon allegedly new facts.

There is also a requirement that any amendments be made seasonably. The defendant had two and one-half months from the time it got the new information from Polite until the final closing of discovery, and waited another five or six weeks after that before filing the supplemental answers. This was clearly not acting seasonably. Defendant argues that it was not until final preparations for trial that counsel for defendant fully appreciated the significance of the new facts. This excuse is neither convincing nor valid. The defendant's counsel was aware that discovery would close on May 30, 1973, and must implicitly be held to some duty to evaluate the evidence and prior discovery to determine if any further discovery was needed. This is not a case like Greyhound, supra, where the new facts were not discovered until after the close of discovery. For purposes of determining timeliness in procedural matters of this sort, the beginning time is the date when the facts are discovered, not some nebulous date when counsel first realized that there was some significance to them. To adopt such a standard as the defendant suggests would throw the procedural rules of the courts into a state of utter confusion.

The district judge did not abuse his discretion by not allowing the untimely raising of new issues by defendant.

In accordance with this ruling, the refusal to allow evidence on this issue was also not error. Parties need not be allowed to bring in through the back door those issues which they were too late in bringing to the front. This court held in the Greyhound case that it was within the discretion of the trial court to control the timetable for discovery, and that Local Rule 20 was proper under Rule 83, Fed.R.Civ.P., with a purpose of timely formulation of issues to be tried.

## IV.

Defendant's fourth claim of error is that the district judge abused his discretion in disqualifying one of the defendant's proposed expert witnesses. Defendant sought to have one J. Wesley Hickman testify about customary fees paid to finders in corporate acquisitions. Plaintiff objected on the grounds that Hickman had never acted on behalf of a buyer in such transactions but only for sellers, and also that the witness had only dealt with one such transaction since 1967. The district judge sustained the objection on the basis of having represented only sellers, and disqualified the witness. Defendant contends that there is no difference between representing a buyer and a seller and, therefore, the disqualification is an abuse of discretion.

It is well settled in Missouri and in this circuit that the trial judge is given broad discretion in determining the qualifications of proposed expert witnesses, and that these rulings are to be overturned only if there is an abuse of discretion or clear error of law. State ex rel. State Highway Commission v. Heim, 483 S.W.2d 410 (Mo.App.1972); Love v. United States, 141 F.2d 981 (8th Cir. 1944).

There is nothing in the record to show whether there would be a difference between representing the buyer and the seller in such transactions. However, defendant's other expert witness testified that there would be a difference in the fee where a finder was acting on an idea initiated by him rather than on a request from a client that he seek possible acquisition candidates. It is apparent from this that all finder's fees are not the same. It is important that expert witnesses have experience in transactions that are as similar as possible to the transaction upon which they are being asked to comment. In light of Mr. Hickman's limited experience in the role of finder, and absent any showing that the fee would be the same no matter which side was being represented, this court is not prepared to second-guess the district judge who was much closer to the situation. There is no clear error of law found here, and no abuse of discretion.

For the foregoing reasons, the judgment of the district court is affirmed.