Dicky D. VOEGELI and Sharon Voegeli, Appellants,

v.

Harvard R. LEWIS and Methodist Hospital, a corporation, Appellees.

No. 76–1690.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 18, 1977.

Decided Dec. 30, 1977.

Gerald L. Reade, Yankton, S. D., for appellant; John R. Kabeiseman, Yankton, S. D., on the brief.

Carleton R. Hoy, Sioux Falls, S. D., for appellee Lewis.

Joseph H. Barnett, Aberdeen, S. D., for appellee Methodist Hospital.

Before LAY and WEBSTER, Circuit Judges, and REGAN, Senior District Judge.*

WEBSTER, Circuit Judge.

This appeal requires us to review the evidence and trial rulings in a medical malpractice suit[1] resulting in a jury verdict in favor of the treating doctor and the hospital in which the treatment occurred.

On Saturday, May 27, 1972, thirty-five-year-old Dicky Voegeli was riding a friend's motorcycle near Mitchell, South Dakota, when it tipped over at a speed of approximately five miles per hour. Voegeli fell from the motorcycle, but was not struck by it. Immediately after the fall, Voegeli's right leg began to hurt and there was swelling around his knee. Friends took him to Methodist Hospital, one of two hospitals in Mitchell. He arrived at approximately 12:30 p. m., one hour after the accident occurred. A nurse in the emergency room called Dr. B. P. Skogmo, a general practitioner. Dr. Skogmo looked at Voegeli's leg and called in appellee Dr. Harvard R. Lewis, a local specialist in orthopedic surgery.

Approximately one-half hour after Voegeli arrived at the hospital, Dr. Lewis saw him in the x-ray room. He read Voegeli's x-rays and ordered him admitted to the hospital. The physician's report, prepared by Dr. Lewis, indicated that Voegeli had suffered a fracture of the medial condyle of the right tibia and hemarthrosis[2] of the right knee. A nurse called Dr. Lewis back to the hospital at 6:45 that evening. He was informed of nurses' notes stating that Voegeli's leg appeared "slightly mottled," that the patient complained his toes felt cold, and that he was unable to move them. At 7:05 p. m., Dr. Lewis again examined Voegeli.

On Monday morning, May 29, Dr. Lewis put a full cast on Voegeli's leg, leaving the toes exposed. Because of complaints that he was in constant pain, the cast was removed on Thursday morning, June 1, and he was informed that Dr. Lewis and another doctor would perform exploratory surgery. After surgery, which was performed Thursday evening, he was told that due to impaired circulation it would be necessary to amputate part of his leg. He signed an authorization and on Saturday, June 3, his leg was amputated at the knee joint. He was discharged from the hospital on June 10, but had to be rehospitalized on June 26 because of a staph infection that had developed in his leg stump.

Voegeli and his wife, Sharon, subsequently instituted an action against Dr. Lewis and Methodist Hospital, alleging *inter alia,* that the negligent failure of the defendants to follow good medical practice proximately caused the amputation of Voegeli's leg. The case was tried to a jury, which returned verdicts in favor of both defendants. Following entry of judgment on these adverse verdicts, and the denial of their motion for a judgment notwithstanding the verdict and for a new trial on the issue of damages, or in the alternative for a new trial, the Voegelies brought this appeal.

Appellants contend that, based upon the undisputed evidence, the District Court

---

* The Honorable John K. Regan, United States District Court for the Eastern District of Missouri, sitting by designation.

1. Jurisdiction was founded on diversity of citizenship and the requisite amount in controversy. *See* 28 U.S.C. § 1332.

2. Hemarthrosis is bleeding into the joint.

should have granted their motion for a directed verdict and, for the same reason, judgment in their favor notwithstanding the verdict. Appellants alternatively contend that based upon the weight of the evidence and numerous prejudicial trial errors they should have been granted a new trial. For the reasons stated herein, we affirm the judgment as to appellee Methodist Hospital but reverse and remand for a new trial as to appellee Lewis.

## I.

### Motion for Judgment N.O.V.

Appellees contend that the negligence of Harvard R. Lewis and Methodist Hospital was so clearly established that the District Court should have taken that issue from the jury and directed a verdict, or should have entered a judgment in their favor notwithstanding the defendants' verdict.

An appellate court may not substitute its view of the facts for that of the trier of fact unless it is in a position to hold that reasonable minds, viewing the evidence in the light most favorable to the prevailing party, could only have found otherwise than the trier of fact. *Russ v. Ratliff,* 538 F.2d 799, 804 (8th Cir. 1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977). *See* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2524, at 541–44 (1971). In *Griggs v. Firestone Tire & Rubber Co.,* 513 F.2d 851, 857 (8th Cir.), *cert. denied,* 423 U.S. 865, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975), *citing Hanson v. Ford Motor Co.,* 278 F.2d 586, 596 (8th Cir. 1960), we held that, in passing upon a motion for judgment n. o. v., the trial court and the appellate court are:

(1) to consider the evidence in the light most favorable to the * * * parties prevailing with the jury; (2) to assume

that all conflicts in the evidence were resolved * * * in favor of the [prevailing parties]; (3) to assume as proved all facts which [the prevailing parties'] evidence tends to prove; (4) to give the [prevailing parties] the benefit of all favorable inferences which may reasonably be drawn from the facts proved; and (5) to deny the motion if, reviewing the evidence in this light, reasonable men could differ as to the conclusion to be drawn from it.[3]

Most of the historical facts are not in dispute and are well established in the lengthy record. The clinical evidence detailing the nature of the injury and the treatment that followed is largely uncontested. One important factual issue survived for the jury to resolve: whether or not Dr. Lewis took a pulse on the first night at the hospital. According to Dr. Lewis' testimony, he inspected the leg at 7:05 p. m., following a telephone report by Nurse Preston that the leg appeared mottled and cold and Voegeli could not move his toes. Lewis did not take a pulse at that time. He testified that he returned to the room alone a few minutes later, however, and checked for a pulse.[4] Finding one, he noted this on the chart.

As we read the record and briefs, it appears that appellants sought to cast doubt on this testimony. One of plaintiffs' experts testified that if the artery had ruptured it would not have been possible to find a pulse, although Lewis' expert, Dr. H. Phil Gross, testified that Lewis might have been misled by *collateral circulation.* Whether Lewis really did take a pulse and whether he actually found one are disputed issues of fact and were properly presented for jury determination. Failure to act promptly when no pulse could be found, or failure to take a pulse at all under these

---

**3.** It is unnecessary for us to decide whether the federal or the South Dakota standard should be applied in determining the sufficiency of the evidence on a motion for judgment notwithstanding the verdict because both are substantially the same. *See Heiser v. Rodway,* 247 N.W.2d 65, 68–69 (S.D.1976); *Beck v. Wessel,* 237 N.W.2d 905, 907 (S.D.1976).

**4.** According to Dr. Lewis' testimony, when he was recording the cold feeling Voegeli was still experiencing in his right foot, and his cold but not blanched skin, it occurred to him that "probably there was some embarrassment of the popliteal vessels and its function."

circumstances might well have been so flagrantly negligent that the court would need to intervene in the jury's verdict. We cannot conclude, however, on this record, that the jury could not reasonably have found Dr. Lewis to have in fact taken and found a pulse on the night of May 27.

▮ Negligence in medical malpractice cases must be established by the testimony of medical experts. *See Carlsen v. Javurek,* 526 F.2d 202, 207 (8th Cir. 1975). The medical experts who testified in this case differed on whether the monitoring procedure followed by Dr. Lewis was wanting in ordinary care. Appellants' experts, Drs. Lesher, Howe, Savage, and Lichtor gave strong testimony that Dr. Lewis had departed from good medical practice by failing to follow up on the patient's symptoms: knee pain, foot and lower leg coolness, and an inability to move ankle or toes. They stressed the need for early detection of vascular impairment, which in turn calls for more intensive monitoring than was given in this case.

In defense, Dr. Lewis offered the testimony of Dr. H. Phil Gross, an orthopedic surgeon. Dr. Gross testified that a reasonably well qualified surgeon might have taken a pulse when the patient was examined upon admission to the hospital, but that "he might not have if he was convinced that the circulation was good." He testified that if he were called in, he would assess the entire patient; he would assess the leg; and he would assess the circulation, first by observation, by palpation, and by manipulation. He conceded that a plateau fracture and swelling should alert a doctor to the possibility of a laceration of the popliteal artery and that taking a pulse is one way to find out if an artery has been injured. He also agreed that pain is a symptom of lack of circulation, and that if a foot is numb or cold there is reason to suspect lack of circu-lation. Nonetheless, Dr. Gross testified that no rule of medicine required Dr. Lewis to take a pulse, and "if he used his clinical judgment in assessing the circulation of that leg, and felt it was adequate at the time, then I don't think there's any law or rule that holds him to take a pulse." [5]

Dr. Lewis conceded that on his first examination he did not spend over five minutes with Voegeli. He saw some swelling but not much difference between the appearance of either leg. When he visited Voegeli later in the evening in response to the nurse's call, he was aware that Voegeli still had a cold feeling in his right leg and that the skin was cool but not blanched. He was apparently reassured, however, when he was able to find a pulse. In all, although he was the only doctor caring for Voegeli, Dr. Lewis spent about 12–13 minutes with his patient from the time Voegeli was admitted to the hospital on May 27 until Lewis gave him a physical examination and applied the cast on May 29. Lewis did not take a pulse before applying the cast because "the leg didn't appear to be that badly embarrassed. I felt there was adequate circulation." He did not think the mottled appearance of the leg was an indication of dangerous circulatory impairment. He testified that if a popliteal artery and vein are lacerated, the area should be pale or white, not mottled. All of the experts testified to the contrary.

Notwithstanding his awareness of swelling and the fact that swelling in a cast can dangerously impair circulation, Dr. Lewis applied a cast to Voegeli's leg. Dr. Lewis testified that for the first five days he thought he was only dealing with a fracture of the medial condyle of the right tibia and hemarthrosis of the right knee. He became fully alerted to the circulatory problem on June 1, when the cast was removed. Dr. Lewis knew doctors in Mitchell whom he

---

**5.** Plaintiffs' experts criticized in varying degrees other acts or omissions of Dr. Lewis that in their opinion were departures from good medical practice. Among these were: failure to inquire in detail about the injury; insufficient vascular examination and testing; inadequate examination on the third day; and failure to recognize diminishment of pain on the third day as a symptom of nerve death. These departures are significant only to the extent they are part of a pattern of diagnosis that precluded identification of the vascular damage until it was too late to save the leg.

felt were capable of repairing a torn artery, but called in no one until five days after the injury. Until then, he had kept no progress notes on his patient.

There seems to be no disagreement that immediate attention is required once a circulatory problem has been identified. The successful taking of a distal pulse provides an indication that circulation is present; failure to find a pulse, while not conclusive, puts the treating person on notice of a possible impairment. The next steps may vary, according to the experts, but all agree that very careful monitoring is essential in order to arrive at the correct diagnosis in time.

■ There is no doubt that Dr. Lewis should have known and did know that the injury to the knee could have been accompanied by circulatory damage. Symptoms of such damage were immediately apparent: pain, coldness, and an inability to move ankle or toes. Progressive symptoms were similarly apparent. Yet in the entire five-day period Lewis took, at most, one distal pulse, made no tests, such as an arteriogram, ignored x-ray indications of circulatory trouble, and did not call in a vascular consultant until it was no longer possible to repair the artery. When the risk of substantial danger is present and the symptoms are entirely consistent with the presence of that risk, more is required than cursory examination and traditional treatment for obvious, but not potential, injuries.[6] *See Hicks v. United States,* 368 F.2d 626, 629 (4th Cir. 1966). The doctor must make inquiries and perform the additional recognized tests that might serve to disclose the true cause of the symptoms. *See Price v. Neyland,* 115 U.S.App.D.C. 355, 320 F.2d 674, 677 (1963); *Kingston v. McGrath,* 232

F.2d 495, 499 (9th Cir. 1956); *Rosario v. American Export-Isbrandtsen Lines, Inc.,* 395 F.Supp. 1192, 1208 (E.D.Pa.1975), *rev'd on other grounds,* 531 F.2d 1227 (3rd Cir.), *cert. denied,* 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976). All of the medical testimony, including that of Dr. Lewis and his experts, is consistent with this mandate.[7]

■ Conclusive proof of a doctor's negligence, however, will not of itself support a malpractice action. The plaintiff must also show that such negligence was a proximate cause of the injury. 1 D. Louisell & H. Williams, Medical Malpractice ¶ 80 at 213 (1973). In this case it was necessary to prove by a preponderance of the evidence that Dr. Lewis' negligence operated substantially to reduce the chances of saving the leg. *See Hicks v. United States, supra,* 368 F.2d at 632, *cited with approval in, Jeanes v. Milner,* 428 F.2d 598, 605 (8th Cir. 1970). *See also McBride v. United States,* 462 F.2d 72, 75 (9th Cir. 1975). The expert testimony on this subject, however, was not so uniform. The estimates ranged from three to ten hours, measured from the time of the injury, as the period within which it might have been possible to save the leg by vascular surgery. Lewis' experts testified that the success rate was low. Thus the jury could have found, despite Dr. Lewis' negligence, that such negligence did not proximately cause the loss of the leg.[8] Since the evidence on the issue of proximate cause is not conclusive, we must affirm the denial of appellants' motion for judgment n. o. v.

## II.

### *Motion for New Trial*

■ In reviewing a district court's order denying a new trial, appellate courts ordi-

---

6. Dr. Lewis testified that had he taken but not found a pulse upon preliminary examination, he would have called in one of the doctors knowledgeable in this area.

7. Dr. Gross testified that he saw no departure from good medical care throughout the entire period and that he would not have diagnosed the matter differently than did Dr. Lewis. His further testimony, however, totally belies these conclusory statements. Among other things, Dr. Gross testified that a well qualified ortho-

pedic would have engaged in a thorough preliminary examination of the leg and the entire patient; it is clear from the evidence that this did not take place.

8. Similarly, we think there was sufficient evidence before the jury to exonerate Dr. Lewis on his choice of technique for amputation. Evidence on this claim likewise fails to meet the test for a judgment n. o. v.

narily defer to the discretion of the district court and reverse only upon a strong showing that such discretion has been abused. *See Lincoln Carpet Mills, Inc. v. Singer Co.,* 549 F.2d 80, 81 (8th Cir. 1977); *Brown v. Royalty,* 535 F.2d 1024, 1027 (8th Cir. 1977), *citing Sanden v. Mayo Clinic,* 495 F.2d 221, 226 (8th Cir. 1974). *See generally* 11 C. Wright & A. Miller, Federal Courts & Federal Practice § 2818 (1973).

The record reveals that the expert testimony was crucial to the outcome of the case not only with respect to determining the applicable standard of care, but to probable cause as well. The heavy weight properly assigned to the expert testimony by the District Court, exemplified in the Court's instructions,[9] requires us to examine with great care appellants' claim that the District Court's rulings on pre-trial discovery and the scope of cross-examination unfairly prejudiced appellants in presenting their case to the jury.

The only testimony produced by Dr. Lewis to offset the very strong expert testimony offered by appellants' experts [10] was that of two physicians, Dr. H. Phil Gross of Mitchell, South Dakota, and Dr. Robert Van Demark of Sioux Falls, where the trial took place. In the early part of 1974, considerably prior to trial, appellants had demanded, pursuant to Fed.R.Civ.P. 26(b)(4),[11] the names of Lewis' experts, their professional backgrounds, opinions they had formed about the case, and the facts upon which they had based such opinions. On March 18, 1974, appellee Lewis disclosed only that Drs. Gross and Van Demark "may be called as witnesses on behalf of Dr. Lewis, to explain that popliteal complications are very rare and difficult to diagnose and repair."

These inadequate answers prompted a motion to compel answers to interrogatories, which the District Court granted on April 1, 1974. The matter at that time was before Judge Bogue. Supplemental answers thereafter filed on May 1, 1974, stated only that Drs. Gross and Van Demark had "rendered no professional opinion on any of the issues of this litigation, other than as previously answered" and that it was uncertain whether either of them would be called as a witness. Appellants returned to court, this time before Judge Nichol, who ultimately tried the case. The District Court on April 22, 1975, specifically ordered answers to the questions on medical experts, but held that appellants' request for sanctions had been abandoned. Thereafter on July 21, 1975, the District Court denied enforcement of a second set of interrogatories on the same subject, but granted appellants permission to take the doctors' depositions. Appellants did take Dr. Gross' deposition on July 25, 1975, but did not take Dr. Van Demark's deposition because of his

**9.** The Court instructed the jury in pertinent part:

> You must determine the standard of professional learning, skill and care required of the defendant, Harvard R. Lewis, only from the opinions of the physicians and surgeons including the defendant who have testified as expert witnesses as to such standards.

*See also Carlsen v. Javurek,* 526 F.2d 202, 207 (8th Cir. 1975).

**10.** Appellant called the following experts at trial: Dr. Joseph Lichtor (orthopedic surgeon); Dr. Gerald E. Howe (specialist in general and vascular surgery, including repairing damaged arteries); Dr. Robert Charles Lesher (orthopedic surgeon); Dr. Lawrence E. Savage (surgeon with extensive vascular surgical training, Clinical Professor of Surgery at the University School of Medicine, author of numerous publications in the field).

**11.** Rule 26(b)(4) provides in part:

> (b) Scope of discovery. Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:
>
> .    .    .    .    .
>
> (4) *Trial preparation: Experts.* Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
>
> (A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.    .    .    .

written assurance that he had not been engaged as an expert and did not expect to be called. The situation remained unchanged at the commencement of trial, and appellants' counsel did not seek to voir dire the jury about Dr. Van Demark.

*Testimony of Dr. Gross.* At his deposition Dr. Gross conceded that if the artery had in fact been severed, as the subsequent operation confirmed, it would not have been possible for Dr. Lewis to have obtained a pulse, as he testified he did, at about 7:00 p. m. the night of the accident. At trial, however, he testified that it was possible for Dr. Lewis to have found a pulse in the leg from a "collateral source." When cross-examined about this change in position, Dr. Gross testified that subsequent to his deposition, he had read two articles .which caused him to change his opinion. He did not advise appellants of this change in position.

This testimony was in many respects pivotal. It tended to rehabilitate the credibility of Dr. Lewis after appellants' experts had testified that he could not possibly have found such a pulse. The finding of the pulse in turn was relevant to the question whether Dr. Lewis had exercised reasonable medical care.

■ A district court has very wide discretion in handling pretrial discovery and we are most unlikely to fault its judgment unless, in the totality of the circumstances, its rulings are seen to be a gross abuse of discretion resulting in fundamental unfairness in the trial of the case. *See Sanden v. Mayo Clinic, supra,* 495 F.2d at 228; 8 C. Wright & A. Miller, Federal Practice and Procedure § 2006, at 35 (1970). *See also Scroggins v. Air Cargo, Inc.,* 534 F.2d 1124, 1133 (5th Cir. 1976); *Lewis v. Texaco, Inc.,* 527 F.2d 921, 926 (2nd Cir. 1975). While the District Court may not be held to have foreseen the result in this case, we think

such unfairness did result. The District Court advanced no reason for its failure to enforce the original order compelling answers to appellants' interrogatories. Appellants clearly had the right to propound and have these interrogatories answered.

■ Permitting appellants to take Dr. Gross' deposition can hardly be called a sanction; the cost of taking it was never assessed against the appellee. The answers given by appellee Lewis were woefully short of the candor expected for compliance with Rule 26.[12] Because the District Court substituted the right of deposition for full and complete answers to interrogatories, we hold that at a minimum Lewis was required to advise appellants promptly of Dr. Gross' change of opinion just as he would have been required to do had answers to interrogatories been filed, *see Havenfield Corp. v. H & R Block, Inc.,* 509 F.2d 1263, 1272 (8th Cir.), *cert. denied,* 421 U.S. 999, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975); *Greyhound Lines, Inc. v. Miller,* 402 F.2d 134, 143 (8th Cir. 1968). The District Court should have made this a part of its original order. The resulting surprise testimony could only have prejudiced appellants in presenting their case.

*Testimony of Dr. Van Demark.* On March 4, 1976, four days after the trial had started, appellee Lewis advised appellants that Dr. Van Demark might testify in Lewis' behalf. Repeated prior inquiries by plaintiffs' counsel had been turned aside. Appellants objected strongly to permitting Dr. Van Demark to testify, especially since appellants had no opportunity to voir dire the jury to determine if any of the jurors were acquainted with this locally prominent expert. The District Court overruled the objection, but limited Dr. Van Demark's testimony to the two issues suggested in the original answers to interrogatories—rarity,

---

12. Fed.R.Civ.P. 26(e) expressly imposes upon a party who has responded to a discovery request, a continuing duty to make reasonable supplemental responses with respect to "the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify." There is a similar duty to amend a prior response seasonably "if [the party] obtains information upon the basis of which . . . he knows that the response was incorrect when made . . . ."

including difficulty of diagnosis, and difficulty of repair.[13]

Most of Dr. Van Demark's testimony consisted of establishing himself as a well known orthopedist from a well known family of orthopedists who were credited with bringing orthopedic surgery to South Dakota. He testified that he had seen only two or three similar injuries in thirty years of practice, and that the leg was lost in both cases. No real effort, despite appellants' objection, was made to establish the time of these two incidents. His direct testimony ended without any inquiries concerning the difficulty of diagnosis. When appellants' counsel attempted to cross-examine Dr. Van Demark about the recognized symptoms of circulatory impairment, he was cut off by appellee's objections, which were sustained by the District Court as outside the scope of cross-examination. Finally, in closing argument, counsel for appellee hospital was permitted to argue to the jury that "[Dr. Van Demark] wouldn't be here if he thought this was a nonmeritorious case, and I think you can rest assured of that."

It is apparent that Dr. Van Demark's testimony was offered primarily to indicate his confidence in and thus stimulate support for Dr. Lewis. He testified to no facts that were essentially in issue. None of appellants' experts had contended that the injury was a common one; rather, it was their testimony that, although uncommon, the injury could be diagnosed on the basis of well known symptoms. And, the risk of injury to the artery was such that prompt monitoring was a routine requirement to avoid loss of the limb if the injury had in fact occurred. The District Court, however, did not permit cross-examination into this vital area although it had discretion to do so. See Fed.R.Evid. 611(b).

Discovery of expert opinion must not be allowed to degenerate into a game of evasion. Nor should experts ordinarily be permitted to testify when the opposing party has been denied the opportunity to establish the personal relationship of the jurors to the expert, if any. Cf. Tabatchnick v. G. D. Searle, 67 F.R.D. 49 (D.N.J.1975) (testimony of proposed new expert excluded because the need for such testimony had been clear three years earlier and defendants did not have an opportunity to prepare for trial and were unfairly prejudiced). The District Court was no doubt misled into thinking that appellees intended to examine Dr. Van Demark on one of the crucial issues in the case, difficulty of diagnosis. In retrospect, it would have been better before ruling on the motion, to take Dr. Van Demark's testimony out of the hearing of the jury initially, in order to safeguard appellants' right to a fair trial.[14]

We conclude that the expert testimony offered by appellee Lewis was the result of trial court rulings that unfairly prejudiced appellants in the presentation of their case. Given the importance of that testimony and the very strong case made by appellants at trial, we cannot dismiss such rulings as harmless.[15] Because we are satisfied that under all the circumstances appellants did not receive fair consideration of their claims against appellee Lewis, we reverse and remand for a new trial as to him. See Carlsen v. Javurek, supra. The judg-

13. In its order denying the motion for judgment n. o. v., the District Court noted that there had been four or more days during trial in which the Court was in recess and appellants could have taken Dr. Van Demark's deposition.

14. The District Court originally stated to counsel that it thought the locality rule had been abrogated and would instruct the jury accordingly. The Court used the locality language, however, in its instruction on Dr. Lewis' skill and care and intermittently in the instructions concerning the Hospital. We do not intimate our views on the applicability of the locality rule in this action, but suggest that on retrial the District Court make its instructions consistent to avoid confusing the jury, as may well have happened in this trial.

15. Numerous other claims of trial prejudice are asserted. In view of our holding, it is unnecessary for us to reach and respond to these contentions, since they are unlikely to be repeated upon retrial.

ment as to appellee Methodist Hospital is affirmed.[16]

**16.** A careful review of the record convinces us that none of the trial errors complained of in this appeal could have prejudiced appellants in their claim against the hospital. Dr. Lewis clearly was not an agent of the hospital and hence no derivative liability could attach due to Lewis' negligence. The jury heard the direct evidence against the hospital and was fully instructed by the District Court. We find no basis for interfering with its verdict as to this defendant.