

Decided August 11, 1980

IN THE DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

GREGORIO SABLAN MENDIOLA AND )    CIVIL ACTION NO. 79-026
MAGDALENA KING MENDIOLA, )
individually and as personal )
representatives of BRIAN KING )
MENDIOLA, Deceased, )
       )
        Plaintiffs, )
       )
         vs. )    FINDINGS OF FACT AND
       )    CONCLUSIONS OF LAW
GOVERNMENT OF THE NORTHERN )
MARIANA ISLANDS, )
       )
        Defendant. )
_____ )

Plaintiffs Gregorio Sablan Mendiola and Magdalena King
Mendiola, parents of the deceased minor Brian King Mendiola,
brought this action seeking damages for alleged medical malpractice.

This case was tried before the Court without a jury. The
Court having considered the evidence, the written arguments sub-
mitted by counsel after trial, and being otherwise fully advised
in the premises, hereby makes the following findings of fact and
conclusions of law. Any findings of fact equally applicable as
a conclusion of law is hereby adopted as such and conversely any
conclusion of law applicable as a finding of fact is adopted as
such.

## FINDINGS OF FACT

1. The deceased Brian King Mendiola was 5 years and 11 months old at the time of his death. His mother and father were 23 and 33 years old, respectively.

2. On January 18, 1979, at approximately 4:00 p.m., Brian was at home with his family in San Jose Village on the island of Tinian. At that particular time of day, Brian was with his mother in the living room. His father was in the bedroom lying in bed because of the flu. His mother was looking over the electric bills, when unbeknownst to her, Brian went outside of their house to play.

3. In back of the house, Gregorio had built an outside fireplace which stood 4 feet high. Nearby was a board 6 feet high where he kept a plastic container containing kerosene for the kerosene stove located in the kitchen.

4. A few minutes later, Brian came in screaming into the house, his clothes on fire. His father heard the cry, came into the living room, saw Brian's condition, quickly wrapped a towel around him and put out the fire. Mr. Mendiola went out to see what caused the accident. Outside he found the container containing kerosene on the ground in a tipped position. No matches were found nearby.

5. A few minutes later their neighbor (one Harry Cruz) came over and rendered assistance by offering his car. Mr. Mendiola asked Cruz "where had he seen the doctor." Cruz replied that he saw the medex in a store. Mr. Mendiola went to the store named by Cruz and found the medex inside the store. He asked the medex for help and the medex told him to take Brian to the dispensary and the medex would follow him.

6. The medex is Esteban Satur, an employee of the defendant, assigned to the Tinian dispensary to render medical services to the people of Tinian.

7. Upon Brian's arrival at the dispensary, Esteban Satur examined him. He had Brian lie on a bed and wrapped his burns with gauze bandages. He diagnosed Brian's injury as minor burns which would heal within 3 to 5 days. He prescribed water and juices for Brian and also gave Demerol tablets for Brian's pain. (Evidence showed that he suffered first, second, and third degree burns).

8. Mr. Mendiola asked Satur twice to evacuate Brian to a Saipan hospital, but Satur said it would not be necessary. Mr. Mendiola then left to get juices from a store for Brian.

9. Maria King, who is Brian's grandmother, came to the dispensary after being summoned by Harry Cruz (the Mendiola's neighbor). She asked Satur if Brian would be evacuated to Saipan. Satur replied that it was not necessary because the burns were only a minor problem.

10. Magdalena King Mendiola accompanied her husband and son to the dispensary. She also asked Satur to evacuate Brian to Saipan. He told her there was no problem, for the skin was the only part that was burnt and would heal within 3 to 5 days. Esteban Satur left after treating Brian. Mrs. Mendiola stayed with her son all night. Her son was unable to sleep and vomited during the night.

11. Around midnight Satur returned and talked to Mrs. Mendiola. He advised transferring Brian to an airconditioned room "so the skin would dry out and heal faster." Mr. Mendiola moved the bed to the airconditioned room. Brian remained in the room until the following morning.

12. On that day, January 19th, Dr. Jose Chong coincidentally arrived from Saipan. He examined Brian's condition and immediately instructed that the boy be evacuated to Saipan.

13. At approximately 9 a.m., however, Brian died prior to his evacuation to Saipan. His body was evacuated to Dr. Torres Hospital where an autopsy was performed by Dr. Benusto Kaipat. The Certificate of Death shows that the immediate cause of death was "extensive (62%) burn" due to "Pulmonary edema."

14. Qualification requirements for persons to become a "medex" include a high school diploma, an associate of arts degree in nursing, and five to ten years clinical experience after graduation from a nursing school. The formal medex training is a two year program, consisting of one year intensive theoretical classroom work during the first year and one year clinical work during the second year. According to Dr. Kaipat, a medex is considered to have the equivalent professional training and skills somewhere between the most experienced nurses and the least experienced doctors (i.e., one who has just recently graduated from a medical school).

15. Medex personnel are considered "doctors" in the community they practice in. Again, according to Dr. Kaipat, medexs are assigned to relatively isolated and less populous islands such as Tinian and Rota. They can diagnose and treat patients. They also have the discretion to refer more serious cases to Saipan. They are able to consult with regular doctors on Saipan via radio transmitters. They are allowed to prescribe and administer medicine to patients. They are not competent to perform surgery or complicated intravenous procedures. Cases that are beyond their capabilities are referred to the doctors in Dr. Torres Hospital on Saipan.

16. In Dr. Kaipat's opinion, Satur should not only have referred Brian to a surgeon for treatment, but also to have evacuated him to Saipan where better medical facilities and personnel were available.

17. According to Dr. Marciano Santos, Brian's burns covered approximately 60% of his body. Immediate and proper treatment, under ideal conditions available in the continental United States, would have given Brian a better than 50% chance of survival. It would be less anywhere else outside of the continental United States.

84

1. Jurisdiction

This Court has jurisdiction of the subject matter and the parties to this suit pursuant to Title 48, U.S.C., Section 1694a(b).

2. Contributory Negligence

The question whether the measure of care exercised by parents for the safety of their children was such as to constitute negligence contributory to the child's injury may arise where the negligence of the parents is imputed to the child so as to preclude a recovery by or on behalf of the child for an injury caused by the negligence of a third person. 57 Am Jur 2d Negligence, section 377. Parents are therefore chargeable with the duty of exercising ordinary care in the protection of their minor children. Agedppa v. Glougie, 162 P.2d 944, 945 (Cal. 1945).

The defendant argues that the proximate cause of the boy's death was his parent's failure to properly supervise him at play. Defendant cites Agdeppa v. Glougie, supra, in support of his argument that the failure of Brian's parents to supervise him was the proximate cause of his eventual death. Agdeppa and other cases[1] cited by the defendant in support of his proposition that contibutory negligence of parents d. ~rs action for damages is not controlling to the facts of the present ... .e. In Agdeppa, the plaintiff's three year old son was run over and killed by a truck while crossing a city main thoroughfare one and half block from their home. The boy was killed instantly and therefore the issue of medical negligence was not at all involved in that case.

- - - - -- - - - - -

[1] Petersen v. City and County of Honolulu, 51 Haw. 484, 462 P.2d 1007 (1969) (applicability of the parent-child tort immunity doctrine in light of state statute); Gosset v. Van Egmond, 176 Or. 134, 155 P.2d 304 (1945) (defendant-father was negligent for making it possible for his mentally incompetent son to drive the father's car); Keena v. United Railroads of San Francisco, 57 Cal. App. 124, 207 P. 35 (1922) (contributory negligence of the mother constitutes a defense in an action by the father for the death of a child of tender years); Town of Flagstaff v. Gomez, 23 Ariz. 184, 202 P. 401 (1921) (refusal to permit defendants to amend answer so as to plead a good defense before commencement of the trial held error and the cause remanded for new trial.)

In the present case, Brian survived for sixteen hours after the tragic accident occured. He was in an area within earshot's distance of his mother prior to the tragic accident. The law does not impose arduous duty on a parent to watch over her child every moment of every day for that would obviously be unreasonable and impractical, and at variance with ordinary practice in the world in which we live. A line needs to be drawn between providing adequate supervision, and allowing the child freedom to grow and learn.

Measured against this ordinary standard of due care, allowing Brian to play in the yard without constant observation does not seem unreasonable, the more so when the Mendiolas have taken reasonable precaution of storing flamable liquids some six feet above the ground.

Taking the evidence as a whole, considering the location, the availability of both parents, the age of the child, and the brief period during which the child was out of the eyes of his parents, the Court finds and concludes as a matter of law that Brian's parents were not negligent nor were their acts or omissions the proximate cause of his death.

Assuming arguendo that Brian's parents failed to exercise proper care for his safety, the Court still hold that their conduct was not the proximate cause of Brian's death. There is substantial evidence that Brian could have survived his injuries from the accident had the proper measures been taken by the defendant's employee (as discussed herein below). The boy lived for sixteen hours with considerable pain and suffering before a decision was made to evacuate him by Dr. Chong. Under these circumstances, the Court finds that the actions taken by the defendant's employee, Esteban Satur, constituted an independent intervening cause of Brian's death.

86

3. Liability of Defendant due to Erroneous Diagnosis.

It is without question that the medex, Esteban Satur, grossly erred in his diagnosis of Brian's injury. The admissions made by defendant pursuant to Rule 36 of the Federal Rules of Civil Procedure,[2/] and the testimony of Maria King and Magdalena Mendiola, stated to the effect that Satur told them there was no need to evacuate Brian because the burn injuries sustained by him will heal within three to five days. The defendant's own expert witness, Dr. Benusto Kaipat, agreed the burns were so serious that Brian should have been evacuated immediately.

The standard of care with which the action of Esteban Satur must be measured would be that of the Restatement (Second) of Torts § 299A:[3/]

> Unless he represents that he has greater
> or less skill or knowledge, one who under-
> takes to render services in the practice
> of a profession or trade is required to
> exercise the skill and knowledge normally
> possessed by members of that profession
> or trade in good standing in similar com-
> munities.

In Hicks v. United States, 368 F.2d 626 (4th Cir. 1966), the plaintiff brought suit to recover damages for the death of the deceased. The plaintiff alleges that death was due to the negligence of the doctor on duty at the naval dispensary in diagnosing and treating the illness of the deceased. The trial court, concluding that the evidence was insufficient to establish that the

- - - - - - - - - - - -

2/ The relevant factual matters deemed admitted conclusively are as follows: "1. On January 18 and 19, 1979, Esteban Satur was employed by the Commonwealth of the Northern Mariana Islands. 4. Esteban Satur, on January 18, 1979, after having examined and diagnosed the medical condition of Brian King Mendiola, stated that the said Brian King Mendiola's burn injuries were minor and that he would recover within three to five days. 7. Esteban Satur stated that there was no need to evacuate Brian King Mendiola because the burn injuries sustained by Brian will heal within three to five days." Plaintiff's Request for Admissions, p. 2, 3.

3/ Title 1, Section 103 of the Trust Territory Code, pursuant to Section 505 of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America.

doctor was negligent, or that his concededly erroneous diagnosis and treatment was the proximate cause of her death, dismissed the complaint. The Court of Appeals for the Fourth Circuit reversed. The Court held that "only if a patient is adequately examined, is there no liability for an erroneous diagnosis." Hicks v. United States, supra at 630. (footnote omitted.)

The treatment rendered to Brian by Satur must be judged in accordance with section 299A of the Restatement, supra. While the Court finds that medex personnel are considered "doctors" in the community they practice in, this Court cannot and would not hold them to the same standard of care required of a certified physician[4] in treating his or her patient. Such a higher standard of care cannot apply to the medex profession in light of their qualifications and professional training as testified to by the government's medical expert, Dr. Kaipat.

While neither party produced a medex at trial to testify as to what a reasonable and competent medex would do under the circumstances, the Court finds that Dr. Kaipat's testimony, based on his long standing association with the Commonwealth's health services program and his familiarity with the medex program, adequately provided this Court with a standard with which to judge Satur's actions in treating Brian. Dr. Kaipat testified that medex personnel possesed a level of skill and knowledge somewhere between that of an "experienced nurse and least experienced doctor." This standard is adequately supported by the "job description" provided by Dr. Kaipat. Medex personnel are able to diagnose and treat patients. They are allowed to prescribe and administer medicine to patients. Such capabilities clearly indicate that a medex is capable of handling and treating ordinary ailments. Cases that are above and beyond their level of training can and should be referred to regular doctors or hospital in Saipan.

- - - - - - - - - -

4/ One who received a degree of "Doctor of Medicine" (M.D.) from an accredited American school of medicine or an equivalent foreign degree recognized in the United States and Commonwealth and licensed to practice their profession.

88

■ Under the circumstances of this case, Satur should have been able to recognize Brian's critical condition and sought medical assistance outside of Tinian. His duty to treat Brian properly included evacuation of Brian to a hospital in Saipan, particularly where there are no physicians or adequate medical facility that could effectively deal with the nature of his injury on Tinian. As stated in Rahn v. United States, 222 F. Supp. 775, 780 (S.D. Ga. 1963), citing Tvedt v. Haugen, 70 N. D. 338, 294 N. W. 183, 132 A.L.R. 379, 397 (1940):

> "If the physician knows that there is another mode of treatment that is more likely to be successful, which he does not have the facilities or training to give, but which is available from specialists, it is his duty to advise his patient of these facts." (emphasis added)

Further, that court adds that

> "If the physician misleads a patient by not only failing to give him this information but affirmatively assures him of a cure, the physician is liable for the harmful consequences, such as suffered by the plaintiff [in that case]."

Id. at 780.

■ Neither is this Court convinced by the defendant's argument that Brian's parents could have evacuated the boy themselves. The Mendiolas had a right to rely upon the defendant without their calling others in to determine whether the defendant's agent was properly treating their son, and they were not bound to consult other doctors -- who were not available on Tinian -- unless they were fully aware that the defendant's agent (Satur) was not properly treating the injury received by Brian. See Rahn v. United States, supra, at 780. Satur's statement to the parents that Brian's burns were minor and would heal within three to five days, as well as his act of administering treatment of the injury was justly relied upon by the Mendiolas.

89

They did not have the training that Satur had and could not have been expected to question his judgment.

It is clear that "[w]hen the risk of substantial danger is present and the symptoms are entirely consistent with the presence of that risk, more is required than cursory examination and traditional treatment for obvious, but not potential injuries." Voegeli v. Lewis, 568 F.2d 89 (8th Cir. 1977) (footnote omitted.) The photographs admitted in evidence bears out the undeniable conclusion that Brian's life was in danger from the burns he had received and something more had to be done than merely wrapping him in bandages and giving him analgesic tablets.

4.  Proximate Cause of Brian's Death

The Court, however, believes conclusive proof of a treating medex's negligence, in and of itself, does not support a malpractice action. The plaintiff must also show that such negligence was a proximate cause of the injury. Voegeli, supra, at 94. As was pointed out in Daniels v. Hadley Memorial Hospital, 566 F.2d 749 (D.C. Cir. 1977), a case involving the medical mismanagement of a patient's already potentially fatal condition:

> The Hicks decision, and the cases which have followed it, illustrate that there are at least two important factors relevant to the issue of causation in cases involving negligent treatment of a potentially fatal condition: first, the patient's chances of survival if properly treated according to medical procedures generally recognized as appropriate under the circumstances; and second, the extent to which the patient's chances have been reduced by improper departure from those established procedures. We are not suggesting, as some courts have, that these two factors can be reduced to precise verbal formulae, supplanting the "substantial factor" test. We do not think it is either possible or desirable to reduce the "substantial factor" test to lower and more concrete terms in this way. We do believe, however, that in considering the question of causation in a case such as this, the finder of fact must at least take into account both the patient's chances of survival and the extent to which defendant has interfered with these chances. 566 F.2d at 757-758 (footnotes omitted)(emphasis added).

90

Esteban Satur's erroneous diagnosis was clearly the result of inadequate examination. Said diagnosis led to his decision not to consult with doctors on Saipan nor to evacuate Brian to Saipan, thereby resulting in inadequate treatment which substantially lessened Brian's chances of survival. According to plaintiff's medical expert, Dr. Marciano Santos, Brian's burns were mostly second and third degree and damaged about sixty percent of his entire body. The proper treatment, according to Dr. Santos in such a serious case, would have been to start an intravenous line supply to replace the loss of fluids due to shock. He testified that shock can be minimized by immediate application of intravenous line. In Brian's case, he should have been given double the amount needed within eight hours. Dr. Santos stated that the first twenty-four hours are crucial and there is a high chance of death if proper treatment is not applied. Once treatment for shock has been rendered, the next problem is that of infection. While it may not have been within Esteban's capability to render intravenous treatment, he should have, according to Dr. Kaipat, evacuated him to Saipan which was well within his power and ability to decide and do. His failure to do so substantially lessened Brian's chances of survival.[5]

5. Damages

Awards for damages in an action for wrongful death are governed by Title 6, Trust Territory Code, section 203(1) which provides as follows:

- - - - - - - - - -

[5] There were conflicting testimonies between Dr. Santos, who is the plaintiff's medical expert, and Dr. Kaipat who is the government's medical expert as to what was Brian's chances of survival had he been evacuated immediately. Dr. Santos testified that Brian would have a slightly better than 50% chance in an ideal condition (meaning a burn center in the mainland), while Dr. Kaipat placed it at 25% in a burn center in Texas. Dr. Santo testified that under more improved conditions (than the Tinian dispensary), Brian would have had a better chance of survival. Taking into account the credibility and interest of both medical witnesses, the Court concludes from their testimonies and other facts brought out in the trial that Brian had a substantial chance of survival. The Court declines to "peg" what this exact figure would be, but the Court concludes from a preponderance of the evidence that Satur had substantially interfered and lessened Brian's chances of survival by his negligent diagnosis and negligent failure to evacuate Brian to Saipan, which denied him proper medical care and attention, thereby meeting the two prong test of the Hicks case. See Daniels v. Hadley Memorial Hospital, page 10 above.

91

The trial court may award such damages not exceeding the sum of one hundred thousand dollars, as it may think proportioned to the pecuniary injury resulting from such death, to the persons, respectively, for whose benefit the action was brought; provided, however that where the decedent was a child, and where the plaintiff in the suit brought under this chapter is the parent of such child, or one who stands in the place of a parent pursuant to customary law, such damages shall include his mental pain and suffering for the loss of such child, without regard to provable pecuniary damages.

Accordingly, the Court hereby awards the parents of Brian King Mendiola, a minor, [6] the amount of $35,000.00 as pecuniary damages resulting from the wrongful death of their son.

The Court is also empowered by the statute to award the parents damages for mental pain and suffering for the loss of their child, without regard to provable pecuniary damages. Taking into account Brian's age, his role in the family as the eldest and only son, and the relationship between he and his parents, the plaintiff is entitled to damages from the defendant for mental pain and suffering in the total amount of $20,000.00.

Judgment, therefore, will be entered in plaintiff's favor in the total sum of $55,000.00 and costs.

DATED:  Saipan, Northern Mariana Islands this _____ day of AUGUST, 1980.

ALFRED LAURETA
Judge of the above-entitled Court

- - - - - - - - - -

[6]  In a case of a child, pecuniary damages in wrongful death action is the excess in present value in dollars of the services which the next of kin may reasonably have expected from deceased over the additional expense which they would have incurred in raising him. Ichitaro v. Lotius, 3 T.T. Rep. 3 (Truk Dist. 1965) (damages for wrongful death of a 10 year old girl).